No. 18-1213

# United States Court of Appeals for the Federal Circuit

ASHFORD UNIVERSITY, LLC,

*Petitioner,*

v.

SECRETARY OF VETERANS AFFAIRS,

*Respondent.*

## PETITIONER'S CORRECTED OPENING BRIEF

GERARD D. KELLY
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

CARTER G. PHILLIPS
   *Counsel of Record*
KWAKU A. AKOWUAH
TOBIAS S. LOSS-EATON
DANIEL J. HAY
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8000
Fax: (202) 736-8711

*Counsel for Petitioner Ashford University, LLC*

## __CERTIFICATE OF INTEREST__

Counsel for Petitioner Ashford University, LLC, certifies the following:

1.    The full name of every party represented by me is:

Ashford University, LLC.

2.    The name of the real party in interest represented by me is:

Ashford University, LLC.

3.    All parent corporations that own 10 percent or more of the stock of the party represented by me are:

Bridgepoint Education, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

N/A.

5.    A statement of related cases is set forth at page 7 of this Brief.

Dated:  February 15, 2019        By:    /s/ Carter G. Phillips
                              Carter G. Phillips
                              *Counsel for Ashford*
                              *University, LLC*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION ............................................................................... 1

STATEMENT OF RELATED CASES ................................................... 7

JURISDICTIONAL STATEMENT ...................................................... 8

STATEMENT OF THE ISSUES ......................................................... 8

STATEMENT OF THE CASE ............................................................. 9

    A.    The GI Bill Assigns the States Primary Responsibility for Approving Institutions and Courses of Study. .................. 9

    B.    Ashford's Flexible and Affordable Courses Are Popular with Service Members and Veterans. .................................. 13

    C.    VA Undertakes to Disrupt Ashford's Approvals. .................. 15

    D.    VA Announces New Rules Asserting Supervisory Authority over SAA Approval of Online Courses and Seeks to Immediately Enforce them Against Ashford. ........ 19

    E.    Ashford Petitions for Review. ................................................. 20

SUMMARY OF ARGUMENT ............................................................ 25

ARGUMENT ..................................................................................... 31

    I.    STANDARD OF REVIEW ...................................................... 31

    II.    THE LEGAL INTERPRETATIONS ANNOUNCED IN THE LETTER ARE SUBSTANTIVELY AND PROCEDURALLY INVALID. ............................................. 32

        A.    VA's Attempt to Override the Arizona SAA's Approval Violates Statutory Restrictions Imposed by Congress. ................................................................. 33

B.  The Letter Is Procedurally Invalid Because It Improperly Amends VA's Regulations Without Notice or Comment. ...................................................... 36

C.  VA's Decision to Give Jurisdictional Effect to Its Previously Non-Jurisdictional "Main Campus" Definition Is Arbitrary and Capricious. ........................ 42

III.  THIS COURT HAS JURISDICTION TO REVIEW VA'S IMPROPER RULEMAKING. ................................................ 46

CONCLUSION ........................................................................................ 52

STATUTORY AND REGULATORY ADDENDUM

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page**

## Cases

*ABM Onsite Servs.-W., Inc. v. Nat'l Labor Relations Bd.,*
849 F.3d 1137 (D.C. Cir. 2017) ............................................................ 44

*Am. Mining Cong. v. Mine Safety & Health Admin.,*
995 F.2d 1106 (D.C. Cir. 1993) ............................................................ 49

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000) ............................................ 3, 30, 37, 49

*Arkema Inc. v. EPA,*
618 F.3d 1 (D.C. Cir. 2010) .................................................................. 43

*Ashford Univ., LLC v. Iowa Dep't of Educ.,*
No. CVCV 54775 (Iowa Dist. Ct. Polk County) .................................. 17

*Batterton v. Marshall,*
648 F.2d 694 (D.C. Cir. 1980) ............................................................. 48

*Coal. for Common Sense in Gov't Procurement v. Sec'y of
Veterans Affairs,*
464 F.3d 1306 (Fed. Cir. 2006) ................................................... *passim*

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund,*
138 S. Ct. 1061 (2018) ......................................................................... 40

*Encino Motorcars, LLC v. Navarro,*
136 S. Ct. 2117 (2016) ...................................................... 6, 28, 29, 43

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ....................................................................... 42, 43

*Gray v. Sec'y of Veterans Affairs,*
875 F.3d 1102 (Fed. Cir. 2017), *cert. granted,* 139 S. Ct.
541 (Nov. 2, 2018) ................................................................................ 7

iv

*Int'l Custom Prods., Inc. v. United States*,
  748 F.3d 1182 (Fed. Cir. 2014) ........................................... 36

*McKinney v. McDonald*,
  796 F.3d 1377 (Fed. Cir. 2015) ................................... 29, 46, 47, 48, 50

*Morton v. Ruiz*,
  415 U.S. 199 (1974) ..................................................... 52

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
  Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................... 43

*NLRB v. Wyman-Gordon Co.*,
  394 U.S. 759 (1969) ..................................................... 52

*Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*,
  979 F.2d 227 (D.C. Cir. 1992) ........................................ 42

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans
  Affairs*,
  330 F.3d 1345 (Fed. Cir. 2003) ...................................... 51

*New York v. Fed. Energy Reg. Comm'n*,
  535 U.S. 1 (2002) ....................................................... 33

*Paralyzed Veterans of Am. v. West*,
  138 F.3d 1434 (Fed. Cir. 1998) ...................................... 49

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ................................... 4, 26, 28, 36, 42

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ...................................................... 36

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ......................................... 48

*U.S. Telecom Ass'n v. FCC*,
  400 F.3d 29 (D.C. Cir. 2005) ......................................... 37

*United States v. E-Gold, Ltd.*,
   550 F. Supp. 2d 82 (D.D.C. 2008) ....................................................... 40

## Statutes and Regulations

5 U.S.C. § 551(4) ..................................................................... 30, 48

   § 552(a)(1) ...................................................................... 2, 8, 31

   § 553 ............................................................................ 6, 31, 36, 41

   § 706(2) ........................................................................... *passim*

38 U.S.C. § 502 ...................................................................... *passim*

   § 3671 ........................................................................................ 10

   § 3672 ........................................................................... *passim*

   § 3673 ............................................................... 4, 8, 10, 26, 33

   § 3674A ........................................................................... 12, 34

   § 3679(c) .......................................................................... 12

   § 3682 ............................................................... 4, 8, 11, 25, 34

38 C.F.R. § 21.4150 ................................................................... 11

   § 21.4151............................................................... 11, 26, 34, 35

   § 21.4152............................................................................ 11, 12

   § 21.4155............................................................................ 12

   § 21.4200............................................................................ 41

   § 21.4250............................................................................ *passim*

   § 21.4266............................................................... 3, 6, 27, 32, 39

Proposed Rules, 68 Fed. Reg. 38,657 (June 30, 2003) ............................ 41

## Other Authorities

Ashford Univ., *Ashford University Honored in Military Advanced Education & Transition's 2017 Guide to Colleges & Universities* (Nov. 29, 2016), https://www.ashford.edu/about/media-room/press-releases/ashford-university-honored-in-military-advanced-education-transitions-2017-guide-to-colleges-universities ..................................................... 15

Ashford Univ., *Student Characteristics*, https://www.ashford.edu/institutional-data/behind-numbers/student-characteristics (last visited Jan. 28, 2019) .......................... 13

*Best for Vets: Colleges 2016*, Military Times, https://bestfor-vets.militarytimes.com/2016/colleges/ online-nontraditional/ (last visited Jan. 29, 2019) ....................................... 15

Cal. State Approving Agency for Veterans Educ., *Title 38 – Notice of Intention Not to Act* (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/1305323/000130 532318000011/bpi201710-kxexx992.htm ........................................... 21

U.S. Dep't of Veterans Affairs, *Ashford Univ. – G.I. Bill Comparison Tool*, https://www.va.gov/gi-bill-comparison-tool/ (last visited Jan. 28, 2019) .......................................... 13

U.S. Dep't of Veteran's Affairs, *Education and Training*, http://www.benefits.va.gov/gibill/history.asp (last visited Jan. 28, 2019) ...................................................................... 9

# INTRODUCTION

On November 9, 2017, the Department of Veterans Affairs ("VA") notified Petitioner Ashford University, LLC ("Ashford") that it "intend[ed] to suspend payment of educational assistance and suspend approval of new enrollments and reenrollments" of Ashford's veteran students in just 60 days' time. *See* Appx0001–0003 (the "Letter" or "VA's Letter"). VA thus threatened immediately to eliminate access to GI Bill educational assistance, such as tuition benefits and monthly housing allowances, for incoming Ashford students. Students already enrolled would not have been immediately affected, but the Letter strongly hinted that another shoe would soon drop. It said that absent "corrective action," VA would convene an administrative body "to assist [VA] in making a determination as to whether educational assistance should be discontinued for *all* individuals enrolled in [Ashford's] online courses." Appx0003 (emphasis added).

VA's draconian threat was not based on any assertion of wrongdoing by Ashford. VA's complaint was purely technical—indeed, it was ostensibly directed at an agency of the State of Arizona. Under the GI Bill,

1

"the State approving agency for the State where [an] educational institution is located" is given authority to approve "course[s] of education." 38 U.S.C. § 3672(a).  VA's complaint was that "the Arizona State Approving Agency"—which had approved Ashford's online educational courses in July 2017—"has provided insufficient evidence to establish that it has jurisdictional authority over [Ashford's] online programs."  Appx0001.

In making this assertion, VA's Letter applied two new legal interpretations to Ashford, neither of which had ever been formally announced by VA, notwithstanding VA's obligation to "publish in the Federal Register for the guidance of the public . . . statements of general policy or interpretations of general applicability formulated and adopted by the agency."  5 U.S.C. § 552(a)(1)(D).  This Court thus has jurisdiction to review the Letter under 38 U.S.C. § 502, which empowers the Court to review VA's compliance with the rulemaking provisions of the Administrative Procedure Act ("APA").

VA's first new interpretation contends that VA has authority to review and to nullify approval determinations made by State approving agencies ("SAAs").  The second new interpretation effectively revises the text of VA's existing regulations.  It does so by taking a definitional term

from one regulation—where it "does not serve to change jurisdictional authority," *see* 38 C.F.R. § 21.4266(b)(3)—and transplanting that definition to a different regulation that *does* address the jurisdiction of the SAAs (38 C.F.R. § 21.4250).  These legal interpretations clearly are "rules" as the APA defines the term.

An APA "rule" issues, at a minimum, when an agency "bases enforcement actions on the policies or interpretations formulated in the document" or "leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020–21 (D.C. Cir. 2000).  Here, VA based its enforcement action on the interpretations in the Letter, told thousands of Ashford students that Ashford had failed to "abide by certain legal requirements," Appx1302–1303, and told the Arizona SAA that its approvals were invalid because they did not comply with the standards set out in the Letter, Appx1297–1298.  In doing so, VA wrote "rules" that are subject to review under § 502.  And for three separate reasons, these rules violate the APA.

*First*, the Letter's attempt to override the Arizona SAA's approval of Ashford violates the APA's prohibition against agency action that is

3

"not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

The GI Bill assigns "definite duties, functions, and responsibilities" to the SAAs and the VA, respectively. 38 U.S.C. § 3673(a). One of the functions given to the SAAs is the responsibility to determine which courses and institutions are eligible for approval and to adopt their own policies and regulations with respect to approval determinations. *Id.* § 3672(a). Moreover, the GI Bill expressly forbids VA from seeking to interfere with those SAA-assigned functions, declaring that VA may not "exercise any supervision or control, whatsoever, over any State approving agency." *Id*. § 3682.

Despite all this, the Letter asserts that VA has authority to overrule the Arizona SAA's decision to approve Ashford's online programs. That attempt to "supervis[e] or control" the Arizona SAA's approval decisions exceeds Congress's explicit statutory limitations on VA's authority.

*Second*, the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206

4

(2015).  The Letter violates this cardinal command by revising, in practical effect, two existing VA regulations without going through the notice-and-comment process that VA initially used to create them.

The Letter asserts that the Arizona SAA's decision to approve Ashford's online programs, based on the in-state location of Ashford's Online Administrative and Student Services Center, exceeds the jurisdictional limits on the approval of such programs in 38 C.F.R. § 21.4250(a)(3). That provision says that only the SAA for the state where an institution's "main campus" is located may approve an online program.  The term "main campus" is not defined in section 21.4250, thus leaving space for an SAA to apply "such other regulations and policies as the State approving agency may adopt" to the determination. 38 U.S.C. § 3672(a).

The Letter, however, attempts to modify 38 C.F.R. § 21.4250 by *adding* a new definition of main campus—one drawn from a different VA regulation (38 C.F.R. § 21.4266).  But that definition does not and cannot apply to Section 21.4250.  Unlike neighboring VA regulations that apply definitions broadly to a number of provisions, Section 21.4266 explains that its definitions only "apply to the terms used in this section."  Moreover, when it proposed the definitions, VA told the public that they "would

5

apply only to" Section 21.4266.  And VA's claim that Section 21.4266's "main campus" definition limits States' approval jurisdiction is belied by that provision's plain language, which says "[t]he fact that the main campus of the educational institution may be located in another State from that in which the course is being taught will not serve to change jurisdictional authority."  *Id.* § 21.4266(b)(3).

If VA wants to rewrite its regulations, it may at any time seek to do so by following the notice-and-comment rulemaking procedure that Congress set out in the APA (5 U.S.C. § 553).  But VA may not take shortcuts—it may not revise its regulations, directly or indirectly, without giving the public a full opportunity to have their views and policy arguments influence the agency's deliberations and decision.

*Third*, VA's attempt to rewrite Section 21.4250 by adding a definition of "main campus" is arbitrary and capricious.  5 U.S.C. § 706(2)(A). An agency cannot adopt a new interpretation of law without (1) demonstrating awareness that it has changed course and (2) showing that it considered each important aspect of the problem presented.  *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016).  VA did neither.  The Letter does not acknowledge that the cross-application of

Section 21.4266's definition of "main campus" is new. Nor does it explain why the "main campus" definition that VA developed to distinguish between *physical* campuses, in a context where the decision would not "change jurisdictional authority," should also be used to identify the "main campus" for programs of online instruction, particularly in a context that does have jurisdictional consequence.

For these reasons, the Court should grant the Petition for Review and vacate the Letter, and with it the new rules the Letter announced.

## STATEMENT OF RELATED CASES

This is a petition for review of rules adopted by VA and announced in a November 9, 2017 letter to Ashford. Ashford is not aware of (i) any case in any court seeking review of the same rules, or (ii) any case in any court that will directly affect or be directly affected by this Court's decision in this case.

For sake of completeness, however, Ashford notes that on November 2, 2018, the Supreme Court granted review of this Court's decision in *Gray v. Secretary of Veterans Affairs*, 875 F.3d 1102 (Fed. Cir. 2017), *cert. granted*, 139 S. Ct. 451 (Nov. 2, 2018), which concerns this Court's jurisdiction under 38 U.S.C. § 502.

## **JURISDICTIONAL STATEMENT**

This Court has jurisdiction under 38 U.S.C. § 502 to review "[a]n action of the Secretary [of Veteran's Affairs] to which section 552(a)(1) or 553 of title 5 (or both) refers." Jurisdiction is proper under Section 502 because VA's Letter, in practical effect, adopts or amends a procedural, substantive, or interpretive rule—at a minimum it contains "statements of general policy or interpretations of general applicability formulated and adopted by the agency." *See* 5 U.S.C. § 552(a)(1)(D).

VA has previously contended that Ashford's petition does not raise matters within the scope of Section 502. Ashford accordingly addresses the jurisdictional issue below. *See infra* Part III.

## **STATEMENT OF THE ISSUES**

I.      Whether the rules announced or amended in the Letter are invalid because:

> A.   The Letter's claim that VA may review and overrule approval decisions made by SAAs is inconsistent with Congress's directives that the SAAs and VA shall have "definite duties, functions, and responsibilities," 38 U.S.C. § 3673(a), and that VA may not "supervise or control" an SAA, *id.* § 3682;

8

B.   In practical effect, the Letter revises existing VA regulations without first engaging in the notice-and-comment rulemaking process required by the APA;

C.   The Letter's attempt to apply a new definition of "main campus" to the use of that term in 38 C.F.R. § 21.4250 without acknowledging or explaining VA's change in course is arbitrary and capricious; and

II.   Whether 38 U.S.C. § 502 confers jurisdiction over Ashford's petition.

## STATEMENT OF THE CASE

### A.   The GI Bill Assigns the States Primary Responsibility for Approving Institutions and Courses of Study.

The GI Bill is "one of the most significant pieces of legislation ever produced by the federal government—one that impacted the United States socially, economically and politically." U.S. Dep't of Veterans Affairs, *Education and Training*, http://www.benefits.va.gov/gibill/history.asp (last visited Jan. 28, 2019). First enacted in 1944, the GI Bill helps military veterans reintegrate into civilian life. Among other benefits, the current iterations of the GI Bill—the Montgomery GI Bill (1984), Post-9/11 GI Bill (2008), and the Forever GI Bill (2017)—provide military

service members, veterans, and their spouses with tuition assistance up to the full cost of attending an approved college or university of their choice, as well as stipends to help pay for housing, living expenses, textbooks, school supplies, and moving costs.

Recognizing the States' preeminence in matters of education, Congress gave them a prominent role in administering GI Bill benefits. *See* 38 U.S.C. § 3673(a) (assigning "definite duties, functions, and responsibilities" to the States and federal government, respectively). In particular, apart from limited exceptions not relevant here, the States have sole authority to approve schools to participate in the GI Bill program. Congress invited each State to designate a "State approving agency," or SAA, that is responsible for designating GI Bill–eligible institutions. S*ee id.* § 3671. And Congress gave the SAAs authority to approve "a course of education offered by an educational institution" in the "State where such educational institution is located," and made clear that "[a]pproval of courses by State approving agencies shall be in accordance with [federal statutes] and such other regulations and policies as the State approving agency may adopt." *See id.* § 3672(a). Moreover, Congress clearly commanded that VA shall not direct or control the SAAs: "[N]o department,

agency, or officer of the United States, in carrying out this chapter, shall exercise any supervision or control, whatsoever, over any State approving agency, or State educational agency, or any educational institution." *Id.* § 3682.

VA's published regulations thus acknowledge that "[a]pproval by [SAAs] will be in accordance with the provisions of 38 U.S.C. Chapter 36 and such regulations and policies as the agency"—*i.e.*, the SAA—"may adopt not in conflict therewith." 38 C.F.R. § 21.4250(b). VA's regulations also state that SAAs are authorized to exercise all "responsibilities designated to the State under 38 U.S.C. chapter 36," *id.* § 21.4150(a), including "[d]etermining those courses which may be approved for the enrollment of veterans and eligible persons" and "[a]scertaining whether a school at all times complies with its established standards relating to the course or courses which have been approved," *id.* § 21.4151(b)(2)–(3).

Moreover, VA's regulations expressly forbid VA from "exercis[ing] any supervision or control over any State approving agency or State educational agency." *Id.* § 21.4152(a). They further note that VA's power to disapprove a school or course is confined to enumerated "reasons

stated in the law." *Id.* § 21.4152(b)(5); *see, e.g.*, 38 U.S.C. § 3679(c) (authorizing VA to disapprove a course if the institution charges tuition rates higher than the in-state rate).   And, the regulations reflect that VA's relationship with the SAAs is cooperative rather than supervisory. "[I]n conjunction with [the SAAs]," VA conducts an "annual evaluation of each [SAA]" based on "standards developed by VA with State approving agencies."  VA then "take[s] into account the result of the annual evaluation of a State approving agency when negotiating the terms and conditions" of the "contract or agreement" that VA makes with each SAA.  *See* 38 C.F.R. § 21.4155; 38 U.S.C. § 3674A.

The question here is which SAA(s) have authority to approve a particular institution or course of study.  As noted, Congress vested approval authority in the SAA "for the State where [an] educational institution is located," 38 U.S.C. § 3672(a), but did not specify how to determine a school's location for purposes of this provision.  VA regulations do state that with respect to "independent study or . . . correspondence" education, 38 C.F.R. § 21.4250(a)(3), courses may be approved by "the State approving agency for the State where the educational institution's main campus is located."  *Id.*  Section 21.4250 does not, however, contain a

definition of the term "main campus."  Despite the growing prominence of online education, VA has never promulgated regulations addressing the approval of online courses.  It has instead treated online coursework as a species of "independent study" or "correspondence" study.  *See* Appx0001.

## B.    Ashford's Flexible and Affordable Courses Are Popular with Service Members and Veterans.

Ashford is an innovative university that serves tens of thousands of students across the country and around the globe through its state-of-the-art, fully interactive online classrooms and student support network. Ashford's affordable tuition and flexible course schedules are particularly attractive to non-traditional students, such as working parents, mid-career professionals, military servicemembers, and veterans.  Veteran students make up approximately 10% of Ashford's student body, and an additional 10% are active-duty military, military family members, or individuals otherwise eligible for military-related educational benefits.[1]

---

[1] *See, e.g.*, Ashford Univ., *Student Characteristics*, https://www.ashford.edu/institutional-data/behind-numbers/student-characteristics (last visited Jan. 28, 2019); U.S. Dept. of Veterans Affairs, *Ashford Univ. – G.I. Bill Comparison Tool*, https://www.va.gov/gi-bill-comparison-tool/ (last visited Jan. 28, 2019).

Many of Ashford's military and veteran students begin coursework during active-duty service (sometimes while deployed abroad) and then complete their studies as they transition back to civilian life. Other returning service members and veterans choose Ashford because they are able to combine Ashford's flexible courses with their work, reserve, personal, and rehabilitation commitments.

Ashford has developed internal best practices to assist military and veteran students and to help them advance in their lives and careers. Ashford participates in the GI Bill's Yellow Ribbon Education Enhancement Program, under which Ashford agrees to cover veterans' tuition and fees that exceed GI Bill allowances and has entered a memorandum of understanding with the Department of Defense to implement policies to support the unique needs of military and military-family students. Ashford further has affirmed its commitment to the Department of Education's 8 Keys to Veterans Success, which are "steps that postsecondary institutions can take to assist Veterans and Service members in transi-

tioning to higher education, completing their college programs, and obtaining career-ready skills." Ashford has been recognized for its popularity with and value to veteran students and their families.[2]

Ashford's approval to receive GI Bill funding is essential to its military and veteran students. This approval permits Ashford's veteran students to have their tuition, housing, living expenses, and other expenses (such as textbooks) paid for by VA, *see* 38 U.S.C. § 3672(a), and the Department of Defense generally relies on schools' GI Bill approvals in deciding whether to approve other forms of educational assistance for military members, veterans, and their families.

## C.    VA Undertakes to Disrupt Ashford's Approvals.

From 2005 until early 2016, Ashford was continuously approved without any apparent problems by the Iowa SAA, where Ashford's traditional residential courses are taught. Indeed, the Iowa SAA renewed Ashford's approval in March 2016.

---

[2] *See, e.g.*, Ashford Univ., *Ashford University Honored in Military Advanced Education & Transition's 2017 Guide to Colleges & Universities* (Nov. 29, 2016), https://www.ashford.edu/about/media-room/press-releases/ashford-university-honored-in-military-advanced-education-transitions-2017-guide-to-colleges-universities; *Best for Vets: Colleges 2016*, Military Times, https://bestforvets.militarytimes.com/2016/colleges/online-nontraditional/ (last visited Jan. 29, 2019).

Behind the scenes, however, VA began lobbying the Iowa SAA to withdraw Ashford's approval. *See, e.g.*, Appx1295–1296. Evidently, VA's lobbying began in about 2015, and the California Attorney General's office played a role in this effort as well. *E.g.*, Appx0056. VA and the California Attorney General contended that Ashford can be approved only in California, because Ashford's corporate headquarters is located in San Diego. *E.g.*, Appx0387, Appx1134. Recognizing that VA is "statutorily prohibited from exercising control over SAAs," VA officials admitted privately that their strategy with respect to Ashford was to "punish (and, thus, deter)" the Iowa SAA into complying with VA's wishes. Appx1293–1296.

VA's pressure tactics achieved their aim. In May 2016, just two months after re-approving Ashford, the Iowa SAA informed Ashford that the Iowa SAA would no longer act as the approving authority for Ashford's online programs and would withdraw Ashford's approval in 60 days. Ashford sued the Iowa SAA in Iowa state court to block the threatened action, and the Iowa SAA agreed to leave Ashford's approval in place pending the outcome of that litigation, which remains ongoing. *See*

*Ashford University, LLC v. Iowa Dep't of Education*, No. 05771 EQCE080188 (Iowa Dist. Ct., Polk County).[3]

At the urging of the Iowa SAA and the VA, and seeking to ensure that its veteran students' educations would not be interrupted, Ashford applied for approval from the California SAA in June 2016.  Officials of the California SAA, however, said (without providing further explanation) that agency would "never" approve Ashford.  Ashford accordingly withdrew its application.

In 2017, with the Iowa litigation still unresolved and the door to a California SAA approval evidently shut, Ashford tried another path.  It sought an additional approval from the Arizona Department of Veterans' Services, which serves as the Arizona SAA.  Appx0026–0029, Appx0395–0396.  Ashford's Online Administrative and Student Services Center—the nerve center of its online courses, which handles the administration of VA benefits and houses records critical to this task—is located in Phoenix.  *E.g.*, Appx0026, Appx0034, Appx0042.  Following a site visit and a review of Ashford's curriculum, facilities, and records, the Arizona SAA

---

[3] Discovery is currently pending in the Iowa litigation, and merits briefing and argument thereon is expected to take place during 2019.

approved Ashford in July 2017. Appx0026–0029. The Arizona SAA based this approval on its finding that Ashford met the "main campus" requirement stated in 38 C.F.R. § 21.4250(a)(3). Specifically, the Arizona SAA explained that "Ashford University is recognized by [its] Accreditor . . . as having an online program which is based in the State of Arizona . . . . Additionally, Ashford University . . . demonstrates full administrative capability in the State of Arizona." Appx0027.

VA reprised its "punish (and, thus, deter)" strategy, but the Arizona SAA held firm. *See, e.g.*, Appx1293. The Arizona SAA reaffirmed its "determin[ation] that its approval authority extends to online institutions that have an online administrative and services center in Arizona," such as Ashford. Appx0034. VA begrudgingly acknowledged the Arizona SAA's approval on September 13, 2017. It issued Ashford a facility code to use in connection with its Arizona approval—an administrative step necessary for students to use their GI Bill benefits. Simultaneously, VA summarily canceled the facility code for the Iowa campus—ignoring that the Iowa approval remains in place—and directed Ashford to recertify all of its veteran students under the Arizona facility code, which in turn rested solely on the Arizona SAA approval. Appx0047–0048.

VA has not sought judicial review of the Arizona SAA's approval decision, which remains in full force and effect. Instead, behind the scenes, VA has repeatedly threatened not only to deprive the Arizona SAA of federal funding but also to assume its GI Bill-related functions unless the state agency acquiesces in VA's demands that Ashford's approval be revoked. *See, e.g.*, Dkt. 15 Exs. B & C.

### D.  VA Announces New Rules Asserting Supervisory Authority over SAA Approval of Online Courses and Seeks to Immediately Enforce them Against Ashford.

On November 9, 2017, VA sent the Letter. Jointly addressed to Ashford and the Arizona SAA, the Letter announced VA's determination that "the Arizona SAA's approval does not constitute an approval by the SAA for the State where your educational institution is located." Appx0001. VA declared it was "taking this action because the Arizona SAA has provided insufficient evidence to establish that it has jurisdictional authority over your online programs in accordance with 38 C.F.R. § 21.4250(a)(3)." Appx0001. The Letter rested this "conclusion," Appx0001, on an assertion that "[t]he term 'main campus,'" as used in section 21.4250(a)(3), "is defined in 38 C.F.R. § 21.4266(a)(3) as the loca-

19

tion where the primary teaching facilities . . . are located," or alternatively "the location of the primary office of its Chief Executive Officer." Appx0002. The Letter asserted that under this definition, Ashford's "main campus" is in California, and that VA would therefore treat the Arizona SAA approval as a nullity and would "suspend [the] payment of education[] assistance and suspend approval of new enrollments and reenrollments for Ashford University's distance education (i.e., online) programs in 60 days unless corrective action is taken." Appx0001. The Letter further stated that subsequent to the suspension, VA would "refer the matter to [an internal VA committee] to . . . determin[e] whether [to suspend] educational assistance . . . for [all students]." Appx0003.

The same day, VA emailed Ashford's veteran students, informed them that the Letter had been sent, and encouraged them to consider transferring to another educational institution. Appx1302–1303.

### E.    Ashford Petitions for Review.

On November 17, 2017, Ashford petitioned for review. VA subsequently agreed to "voluntarily stay the suspension of GI Bill eligibility" announced in the Letter. VA's stay was "conditioned upon Ashford undertaking corrective action" by applying for approval from the California

SAA.  Dkt. 22 Ex. A, at 1.  Ashford submitted its application to the California SAA in January 2018.  The next month, however, the California SAA decided not to act on Ashford's application, contending (incorrectly) that Ashford had failed to provide certain information requested by the application.  Cal. State Approving Agency for Veterans Educ., *Title 38 – Notice of Intention Not to Act* (Feb. 21, 2018), https://www.sec.gov/Archives/edgar/data/1305323/000130532318000011/bpi201710-kxexx992.htm.

In December 2017, VA moved to dismiss Ashford's petition in this Court for lack of jurisdiction, asserting that the Letter is "an adjudicative determination, not a rule," and arguing that review of the Letter is therefore unavailable under 38 U.S.C. § 502.  VA further sought a waiver of the requirement to file a certified list or index.  Dkt. 9.  Chief Judge Prost denied VA's motion without prejudice, stating that "[t]he court deems it more appropriate for the parties to address the issues in the briefs," Dkt. 19, at 1, and directed VA to file the certified list within 14 days.  *Id.* at 2.

VA's first certified list was materially incomplete.  *See* Dkt. 21.  As explained more fully in Ashford's motion to correct the administrative

record, Dkt. 22, VA's original certified list included only eleven documents totaling just 36 pages, plus Ashford's 323-page academic catalogue. *Id.* at 2. VA took the position that only the few documents that literally had been read by the VA official who signed the letter constituted the entire administrative record. *See* Dkt. 26, at 17–19. Ashford accordingly moved for an order compelling VA to file a complete list reflecting all materials considered by VA, not just the signatory, in issuing the Letter.

Judge Reyna ruled in favor of Ashford, concluding that the administrative record properly "consists of all documents and materials directly or indirectly considered by the agency." Dkt. 28, at 3 (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993)). In particular, Judge Reyna noted Ashford's argument that VA's list omitted documents that were plainly before VA at the time of its decision: (1) a September 18, 2017 letter from Ashford to VA; (2) an October 31, 2017 email and attachment from VA to Ashford; and (3) documents summarized in an internal memorandum. *Id.* at 2; *see* Appx1306 (Sept. 18 letter); Appx1304

(Oct. 31 email attachment); Appx0056 (internal memorandum). Accordingly, Judge Reyna ordered VA to file a supplemental certified list. Dkt. 28, at 4.

VA filed a supplemental certified list, Dkt. 29, but it too was materially incomplete. Ashford explained to VA that the supplemental certified list still excluded the documents specifically referenced in Ashford's motion, did not include any documents showing the involvement of the VA official who signed the Letter, and did not include a single document from the seven weeks leading up to the issuance of the Letter. While VA ultimately agreed to file a second supplemental certified list adding some missing documents, Dkt. 32, it declined to prepare a certified list that encompasses "all documents and materials directly or indirectly considered by the agency." Dkt. 28, at 3. VA instead misconstrued Judge Reyna's order as requiring inclusion only of documents reviewed and considered by the VA official who signed the Letter and individuals who directly consulted that individual. As best as Ashford can tell, VA omitted documents maintained by officials who did not communicate *directly* with Director McClellan (the official who signed the Letter), but who nevertheless were significantly involved in VA's consideration of the positions

announced in the Letter. Rather than engage in more motion practice that would further delay the resolution of this case, Ashford opted to move forward on the basis of an administrative record that it continues to regard as materially incomplete and certainly inconsistent with any notion of transparent agency decision-making.

Ashford also continued to explore the possibility of a negotiated resolution with VA. Ashford agreed, in connection with those settlement discussions, to "submit a renewed application" to the California SAA, in the hopes that the California SAA's response would "allow Ashford and VA to resolve the dispute without further litigation." Dkt. 33 at ¶¶ 4–5. In December 2018, however, the California SAA once again refused to act on Ashford's application. This time, the California SAA suggested it was unable to act because of pending litigation between the California Attorney General and Ashford—although that same litigation had been pending when the California SAA declined to act on Ashford's prior application, and was not among the reasons it had given for declining to act.

On January 2, 2019, VA responded to the California SAA. Rather than encourage the California SAA to approve Ashford, VA made clear its view that the California SAA has "the authority to *deny* approval of

an application." Appx1313. That response is curious to say the least, given that VA's ostensible goal has been to shift Ashford's jurisdictional SAA to California and that a denial would likely inflict immense and needless disruption on the lives and educational programs of thousands of veteran students.

## **SUMMARY OF ARGUMENT**

I.   Ashford seeks review of the legal interpretations announced in the Letter that, according to VA, provide a legal basis for the sanctions imposed by the Letter. Those legal interpretations violate the APA's rule-making requirements for three reasons.

*First*, the Letter is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" and "not in accordance with law," 5 U.S.C. § 706(2), because it directly defies a clear and emphatic statutory command: "Except as provided in section 3674A of this title [addressed to cooperative contracting arrangements], no department, agency, or officer of the United States, in carrying out this chapter, shall exercise any supervision or control, whatsoever, over any State approving agency, or State educational agency, or any educational institution." 38 U.S.C. § 3682.

The plain meaning of that statute is that VA may not supervise or overrule decisions made by SAAs exercising the powers granted by law to those state officials, consistent with Congress's decision to assign "definite duties, functions, and responsibilities" to "the Secretary and each State approving agency," respectively. *Id.* § 3673. The duties specifically assigned by law to the SAAs include determining whether a particular institution or course meets requirements for approval—including the requirement that the institution have a main campus in the SAA's state. *Id.* § 3672(a); 38 C.F.R. § 21.4151(b) ("State approving agencies are responsible for . . . [d]etermining those courses which may be approved for the enrollment of veterans and eligible persons"). The Letter disregards these express statutory constraints in claiming authority to review, and to nullify, approval determinations made by SAAs.

*Second*, the Letter violates the APA requirement that agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez*, 135 S. Ct. at 1206. It does so by interpreting VA's existing regulations in a manner that, in practical effect, announces a profound change to those regulations.

The relevant regulations are 38 C.F.R. §§ 21.4250 and 21.4266. Section 21.4250 addresses the question of State jurisdiction to approve distance and correspondence programs, including online courses. It does so by stating that "only the State approving agency for the State where the educational institution's main campus is located may approve the course for VA training." 38 C.F.R. § 21.4250(a)(2). Importantly, Section 21.4250 does not define the term "main campus."

In contrast, section 21.4266 (entitled "Approval of courses at a branch campus or extension") does *not* address SAA jurisdiction and expressly does not "serve to change jurisdictional authority." *Id.* § 21.4266(b). It instead addresses approval of courses at multi-campus brick-and-mortar institutions by providing that generally speaking, an SAA "may combine the approval of courses offered by an extension of an educational institution with the approval of the main campus or the branch campus is dependent on, if the extension is within the same State as the campus it is dependent on." 38 C.F.R. § 21.4266(e). In that context, and as "appl[ied] to the terms used in this section" alone, Section 21.4266 provides a definition of the term "main campus."

The Letter announces that Section 21.4266's definition of "main campus" now also applies to Section 21.4250. In doing so, it effectively revises *both* regulations improperly, without notice and comment. Section 21.4250 is altered by the Letter, because it now contains a jurisdictionally significant definition that it did not contain during the notice-and-comment process or at enactment. Section 21.4266 is altered because, contrary to the express limitation that its definitions apply only when "used in this section," the Letter now reads the definition of "main campus" to apply to Section 21.4250 as well. VA simply cannot make such changes to its regulations without public notice and comment. *See Perez*, 135 S. Ct. at 1206.

*Third*, VA's decision to apply Section 21.4266(a)(3)'s limited-purpose definition of "main campus" to online-course approval under Section 21.4250(a)(3) is arbitrary and capricious. The APA requires that, at a minimum, an agency's decision to change course must be supported by a reasoned justification that "display[s] awareness that it is changing position and show[s] that there are good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2125–26. VA has failed to meet each of these requirements.

28

The Letter fails to acknowledge the interpretive change reflected in its effort to now cross-apply the definition of "main campus" from Section 21.4266 to Section 21.4250.  It also makes no effort to explain why it would make sense to apply the "main campus" definition originally adopted for the *non-jurisdictional* purpose of distinguishing between physical branch and main campuses to the *jurisdictional* question of where online instruction is "located" for course approval purposes.  VA's position is "arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars*, 136 S. Ct. at 2125.

II.    The Court should reject VA's jurisdictional objection.  This Court has jurisdiction under 38 U.S.C. § 502 to review substantive, interpretive, and procedural rules promulgated by VA, including "any amendments to those rules, and the process in which those rules are made or amended." *McKinney v. McDonald*, 796 F.3d 1377, 1383 (Fed. Cir. 2015); *see also Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1314 (Fed. Cir. 2006).  Of particular relevance, Section 502, by reference to Section 552(a)(1), gives this Court jurisdiction to review "statements of general policy or interpretations of general applicability formulated and adopted by the agency."  And by reference

to Section 553, Section 502 gives this Court jurisdiction to review new or amended legal interpretations that supposedly command compliance from educational institutions and State officials alike.

The supposedly binding legal interpretations stated in the Letter are quintessential "rules," as the APA defines that term. They are "statement[s] of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). They are interpretations that VA says Ashford and the Arizona SAA must follow or else face sanction. Courts have always treated such statements as "rules" within the meaning of Section 553. *E.g.*, *Appalachian Power*, 208 F.3d at 1020–21. At a minimum, these are "statements of general policy or interpretations of general applicability formulated and adopted by the agency," 5 U.S.C. § 552(a)(1)(D), and thus are "action[s] of the Secretary to which section 552(a)(1) . . . refers." 38 U.S.C. § 502.

VA's jurisdictional argument is essentially that the Letter cannot announce new rules because it was issued as part of an adjudication addressed solely to Ashford and the Arizona SAA. That argument misreads this Court's decision in *Coalition for Common Sense*, and at bottom reflects a dangerous contention that VA may evade this Court's Section 502

jurisdiction by acting through informal letters rather than by announcing and amending its rules and legal interpretations transparently in the Federal Register, as the APA requires. The Court should reject that contention. It should instead hold that it has jurisdiction to review the rules announced in the Letter, and it should invalidate those rules.

## ARGUMENT

## I.   STANDARD OF REVIEW

This Court has jurisdiction to review "action[s] of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers." 38 U.S.C. § 502; *see* 5 U.S.C. § 552(a)(1) (setting forth matters that agencies must "publish in the Federal Register for the guidance of the public"); *id.* § 553 (establishing procedures for notice-and-comment rulemaking). Section 502 review proceeds under the APA, which requires the Court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action." *Coal. for Common Sense*, 464 F.3d at 1314 (quoting 5 U.S.C. § 706). The Court must "hold unlawful and set aside" any agency action that is:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by law . . . .

5 U.S.C. § 706; *see Coal. for Common Sense*, 464 F.3d at 1314.

This Court decides questions of subject matter jurisdiction *de novo*.

*See, e.g.*, *Litzenberger v. United States*, 89 F.3d 818, 820 (Fed. Cir. 1996).

## II.    THE LEGAL INTERPRETATIONS ANNOUNCED IN THE LETTER ARE SUBSTANTIVELY AND PROCEDURALLY INVALID.

Two key legal interpretations underpin the Letter.  First, VA claims the authority to review and to nullify an SAA's approval decision.  That conclusion improperly usurps authority that Congress gave to the SAAs, and improperly end-runs Congress's directive that no federal agency or officer may "supervise or control" an SAA.  Second, the Letter depends on the conclusion that the term "main campus," as used in 38 C.F.R. § 21.4250, is controlled by the definition of "main campus" stated in 38 C.F.R. § 21.4266.  This interpretation (a) effectively revises VA's published regulations without notice and comment and (b) is arbitrary and capricious.  Each of these APA violations provides an independent basis for vacating the Letter.

### A.   VA's Attempt to Override the Arizona SAA's Approval Violates Statutory Restrictions Imposed by Congress.

A federal agency may not enact a rule that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C). The first and most basic problem with the Letter is that it clearly violates statutory constraints imposed by Congress. *See, e.g.*, *New York v. Fed. Energy Regulatory Comm'n*, 535 U.S. 1, 18 (2002) ("an agency literally has no power to act . . . unless and until Congress confers power upon it.").

Here, Congress established the GI Bill as a joint Federal-State program that invites participation by State governments in cooperation with VA. Congress made clear that neither VA nor the States may usurp the other's functions by directing that "[t]he Secretary and each State approving agency shall take cognizance of the fact that definite duties, functions, and responsibilities are conferred upon the Secretary and each State approving agency under the educational programs established" by the GI Bill. 38 U.S.C. § 3673(a).

The job of making approval determinations was assigned specifically to the SAAs, who were given express authority to make and implement "regulations and policies" germane to that task. *See id.* § 3672(a)

("Approval of courses by State approving agencies shall be in accordance with the provisions of this chapter and chapters 34 and 35 of this title and such other regulations and policies as the State approving agency may adopt."). VA's published regulations duly reflect this statutory allocation of authority: "State approving agencies are responsible for: (1) Inspecting and supervising schools within the borders of their respective States; [and] (2) Determining those courses which may be approved for the enrollment of veterans and eligible persons." 38 C.F.R. § 21.4151(b).

Congress then confirmed that the GI Bill does not give VA license to supervise or control the SAAs, stating: "Except as provided in section 3674A of this title, no department, agency, or officer of the United States, in carrying out this chapter, shall exercise any supervision or control, whatsoever, over any State approving agency, or State educational agency, or any educational institution." 38 U.S.C. § 3682.[4]

This statutory directive is clear and comprehensive: SAAs have authority, pursuant to federal law, to determine which courses they may

---

[4] The provision cross-referenced here, 38 U.S.C. § 3674A, concerns a cooperative process of annual evaluation of the SAAs by VA in connection with the SAAs' receipt of federal funding. The Letter does not reference or purport to rely upon section 3674A.

approve, and to establish policies and regulations relevant to the approval task. VA, in contrast, is prohibited from "exercis[ing] any supervision or control, whatsoever," over those SAA determinations. If VA has a problem with an approval decision made by an SAA, VA's recourse is to turn to an authority that may properly issue directives to the SAA (*e.g.*, a supervisory state official, or as appropriate, the courts), not self-help.

The Letter disregards Congress's commands. The Letter reviews, and overrules, the Arizona SAA's decision to approve Ashford's online programs, and claims authority to nullify the Arizona SAA's decision. It completely fails to acknowledge the authority given to the States by Congress to adopt and apply such "regulations and policies as the [SAA] may adopt" in connection with their approval authority. 38 U.S.C. § 3672(a); *see also* 38 C.F.R. § 21.4151(b). In short, the Letter reflects a brazen effort by VA to "supervise" and "control" the Arizona SAA—which is exactly what Congress said VA may *not* do.

The Letter thus violates the APA. It reflects VA's adoption of a legal interpretation that is "not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory

right." 5 U.S.C. § 706(2)(A) & (C).  The Letter should be "h[e]ld unlawful and set aside." *Id.* § 706(2).

### B.     The Letter Is Procedurally Invalid Because It Improperly Amends VA's Regulations Without Notice or Comment.

The Letter's second key legal interpretation is also procedurally invalid.  *See* 5 U.S.C. § 706(2)(D).  A cornerstone procedural "mandate" of the APA is that agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez*, 135 S. Ct. at 1206.  Thus, when an agency promulgates a regulation through notice and comment (*see* 5 U.S.C. § 553), it cannot alter the regulation without going through that process again.  *Perez*, 135 S. Ct. at 1206.

Critically, the requirement described in *Perez* attaches "when an agency's interpretation has *in effect* amended its rule," even if it has not done so explicitly.  *Int'l Custom Prods., Inc. v. United States*, 748 F.3d 1182, 1187 (Fed. Cir. 2014) (emphasis added); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 90, 100 (1995) ("APA rulemaking would still be required if [the agency] adopted a new position inconsistent with

any of the Secretary's existing regulations," even if the document adopting that interpretation "does not purport to be a regulation."). Any other approach would allow agencies to sidestep the APA's requirements for making or revising a rule by treating their regulations as having been functionally superseded by some other informal pronouncement. *See, e.g.*, *Appalachian Power,* 208 F.3d at 1024 ("[A]n agency may not escape . . . notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation."); *see also, e.g.*, *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34–35 (D.C. Cir. 2005) (citing cases). The Letter violates these APA principles because it interprets VA's existing regulations in a manner that in effect amends them.

The Letter's central conclusion is that "the Arizona State Approving Authority has provided insufficient evidence to establish that it has jurisdictional authority over [Ashford's] online programs in accordance with 38 C.F.R. § 21.4250(a)(3)." Appx0001. The Letter explains the legal "reasoning" on which this "conclusion" is based:

    (1)  "[38 U.S.C. §] 3672(a)(1) allocates jurisdiction for approval of an educational institution to the SAA where it 'is located.'" Appx0001.

(2) "[38 C.F.R. §] 21.4250(a)(3) implements this authority and clar-ifies that courses offered by independent study may only be ap-proved for VA educational assistance by the SAA for the State in which the institution's main campus is located." Appx0001.

(3) *The term 'main campus' is defined in 38 C.F.R. § 21.4266(a)(3)* as the location where the primary teaching facilities of an edu-cational institution are located." Appx0001–0002 (emphasis added).

(4) The Letter then identifies various considerations that VA looked to in concluding that "the Phoenix, AZ, location is not a teaching facility *for purposes of section 21.4266(a)(3)*," and that the "primary office" of Ashford's "Chief Executive Officer" (which is a factor that section 21.4266(a)(3) looks to in tie-breaker set-tings) is also not in Arizona. Appx0002 (emphasis added).

The Letter's pivotal reasoning is reflected in point 3. It takes a def-inition of "main campus" from one regulation—Section 21.4266—and cross-applies it to a different regulation—Section 21.4250. It is Section 21.4250(a)(3) that addresses jurisdictional authority to approve courses by stating that "only the State approving agency for the State where the

educational institution's main campus is located may approve the course for VA training." But Section 21.4250 does not contain any definition of "main campus" and does not cross-reference any external definition. The Letter's conclusion that the Arizona SAA lacks jurisdictional authority to approve Ashford's programs because its Arizona location does not satisfy the definition of "main campus" contained in Section 21.4266 thus rises or falls on whether VA may validly transplant that definition to Section 21.4250.

The APA principle emphasized by the Supreme Court's *Perez* decision answers that question. Without going through notice and comment (which VA did not do), VA cannot amend its regulations. Yet, in substance, the Letter announces two material changes to VA's regulations. The Letter effectively *adds* a new definition of "main campus" to Section 21.4250. The Letter also effectively *deletes* language from Section 21.4266 that strictly cabins the application of the definitions it contains to its four corners. Specifically, Section 21.4266 states that its definitions solely "apply to the terms used *in this section*." 38 C.F.R. § 21.4266(a) (emphasis added). That language is dispositive. Where "a word is defined to mean something particular 'in this section,' then it will be given

39

that definition *only in that section.*" *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 92 (D.D.C. 2008) (emphasis added); *cf. Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1070 (2018) (noting that "Congress often drafts statutes with hierarchical schemes — section, subsection, paragraph, and on down the line," and that "when Congress wants to refer only to a particular subsection or paragraph, it says so.") (alterations omitted).

Section 21.4266's "in this section" limitation also bears weight because the language of other neighboring regulations confirms that if VA had intended the definitions in section 21.4266 to apply more broadly, it would have used other language to say so. For example, consider 38 C.F.R. § 21.4200—the very first section of the regulatory subpart that contains both section 21.4250 and 21.4266. Section 21.4200 sets out a series of general definitions that are intended to apply to many VA regulations. VA did not leave readers to guess which definitions apply where. VA instead provided a detailed roadmap, stating: "The definitions in this section apply to this subpart, except as otherwise provided. The definitions of terms defined in this section also apply to subparts C, G, H, K, L, and P if they are not otherwise defined for purposes of those subparts."

38 C.F.R. § 21.4200.  If VA had intended for the "main campus" definition in Section 21.4266 also to apply to Section 21.4250, it would have used words like these to say so.

The Notice of Proposed Rulemaking that ultimately gave rise to the definitions in section 21.4266 provides still further confirmation that when VA adopted those definitions, it used the phrase "in this section" to convey its ordinary limitation.  VA wrote: "We further propose that these definitions *would apply only to the section of our regulations that the proposed rule amends.*"  *See* Proposed Rules, 68 Fed. Reg. 38,657, 38,658 (June 30, 2003) (emphasis added).   A notice of proposed rulemaking is used to explain to the public the "substance of the proposed rule," 5 U.S.C. § 553(b)(3), and thus to insure that the public is given adequate notice of the rule that the agency proposes to adopt.  Accordingly, VA should not now be heard to argue (as it did in prior motion briefing, *see* Dkt. 18, at 8), that the rule it adopted actually means something other than what VA promised—and what the regulation's text says in black and white.

VA simply cannot make these changes to its regulations—add definitional language here; delete limiting language there—without giving the public prior notice and an opportunity to comment on the proposed

changes. *See Perez*, 135 S. Ct. at 1206; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (APA "makes no distinction . . . between initial agency action and subsequent agency action undoing or revising that action"); *Nat'l Family Planning & Reproductive Health Ass'n v. Sullivan*, 979 F.2d 227, 235 (D.C. Cir. 1992) (where an agency sees fit to redefine an existing regulatory term with substantive effect, the agency must provide "notice, an opportunity for comment, and an adequate record"). VA did not follow notice-and-comment rulemaking procedures in issuing the Letter, and therefore violated the rulemaking requirements of the APA.

### C. VA's Decision to Give Jurisdictional Effect to Its Previously Non-Jurisdictional "Main Campus" Definition Is Arbitrary and Capricious.

Even if VA could have excised section 21.4266's "in this section" limitation and added a new definition to section 21.4250 without going through notice and comment, its newly announced definition of "main campus" for online institutions would fail another of the APA's rulemaking requirements. It is "arbitrary" and "capricious." *See* 5 U.S.C. § 706(2)(A).

Before an agency issues any rule, such as a supposedly binding interpretation of law, it must provide a reasoned justification that considers all "important aspect[s] of the problem" and reaches a conclusion justified by the facts upon which it relied. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–44 (1983). In particular, when an agency changes its position, including by withdrawing or revising a prior interpretation, it must "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars*, 136 S. Ct. at 2126. Where an agency does not provide this "minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.* at 2125; *see also Fox Television Stations*, 556 U.S. at 515–16; *State Farm*, 463 U.S. at 42 ("[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."); *see also Arkema Inc. v. EPA*, 618 F.3d 1, 6, 9 (D.C. Cir. 2010) (vacating in part EPA rule that failed to acknowledge a change in interpretation of controlling statute).

VA violated this "basic procedural requirement[] of administrative rulemaking." *Encino Motorcars*, 136 S. Ct. at 2125. VA's decision to take

the definition of "main campus" in section 21.4266 and cross-apply it to section 21.4250 constitutes a fundamental change in course. Never before had VA publicly adopted such a rule and as demonstrated above, *see supra* Part II.B, the text and regulatory history of section 21.4266 show that VA did not originally intend that the "main campus" definition would apply outside of section 21.4266. The Letter, however, simply states that section 21.4266(a)(3) *is* "the regulation defining main campus" as used in section 21.4250. Because the Letter completely fails to demonstrate any recognition of a change in course on the part of VA, the Letter is arbitrary and capricious. *See ABM Onsite Servs.-W., Inc. v. Nat'l Labor Relations Bd.*, 849 F.3d 1137, 1146 (D.C. Cir. 2017) (An agency "cannot 'turn[] its back on its own precedent and policy without reasoned explanation.'").

The Letter is also arbitrary and capricious because it fails to explain VA's rationale for cross-applying the "main campus" definition to a new context—an omission that is particularly problematic in light of VA's concession, just days before the Letter issued, that the section 21.4266 definition is "arguably not as well suited to institutions that provide training

solely through an online modality," Appx1304, as it is to the physical campuses addressed in section 21.4266.

In fact, VA's concession understates the contextual differences that make it so anomalous for VA to attempt to use a single definition for both settings. By design, online institutions ordinarily have no "teaching facilities," in the traditional sense of the term (*i.e.*, classrooms). Teachers and students are in different locations—they may even be interacting from opposite corners of the earth. Moreover, as noted above, the "main campus" definition in section 21.4266 expressly does not serve any jurisdictional purpose; but once cross-applied to section 21.4250, it does draw jurisdictional lines—lines that are highly consequential for SAAs, for the educational institutions that must coordinate with the SAAs, and ultimately for the veterans whose ability to access their hard-earned GI Bill benefits may (as here) be disrupted by shifts in VA's approach to those lines.

Given all of this, it was incumbent upon VA to give a reasoned justification for why a single unitary definition of "main campus" should govern both settings. Because VA did not do so, its conclusion is arbitrary and capricious.

## III.    THIS COURT HAS JURISDICTION TO REVIEW VA'S IM-PROPER RULEMAKING.

As explained, the Letter announces new legal interpretations that violate both substantive and procedural requirements of the APA. VA's argument that this Court lacks jurisdiction to consider these claims lacks merit.

This Court has jurisdiction to review "[a]n action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers." 38 U.S.C. § 502. In broad strokes, Section 552(a)(1) describes the matters that an agency must "publish in the Federal Register for the guidance of the public," whereas Section 553 describes the APA's notice-and-comment rule-making requirements. Section 502 has thus been described as giving this Court "jurisdiction to review [1] 'the VA's procedural and substantive rules, [2] any amendments to those rules, and [3] the process in which those rules are made or amended,'" *McKinney*, 796 F.3d at 1383 (Fed. Cir. 2015), as well as "[4] interpretative rules," *Coal. for Common Sense*, 464 F.3d at 1314. Put another way, Section 502 gives this Court jurisdiction to ensure that VA makes new rules in the manner that the APA requires,

and that "any amendments to [existing] rules" are likewise made in accordance with the "process" that the APA demands. *McKinney*, 796 F.3d at 1383.

Here, the Court's jurisdiction over Ashford's petition is particularly clear because Section 552(a)(1)(D) refers explicitly to "statements of general policy or interpretations of general applicability formulated and adopted by the agency." At a minimum, the Letter—which expresses VA's interpretation of broadly applicable statutes and regulations and treats those interpretations as a basis for sanctioning Ashford and overruling the approval decision of the Arizona SAA—states "interpretations of general applicability formulated and adopted by" VA.

Indeed, the Department of Justice recently argued, in a brief to the Supreme Court that concerns the meaning of Section 502, that Section 552(a)(1) "focus[es] on materials that have binding effect either on persons who deal with the agency or on the agency itself." *See* Brief for the Respondent 19, *Gray v. Wilkie*, No. 17-1679 (U.S. Jan. 16, 2019); *see also id.* at 33 ("Section 552(a)(1)(D) is best read to require, at a minimum, that an 'interpretation[]' of general applicability formulated and adopted by the agency' have a 'binding effect' on the agency or interested members

of the public."). On that understanding, the Letter is undoubtedly "[a]n action of the Secretary to which section 552(a)(1) . . . refers." 38 U.S.C. § 502. The Court need only accept the Solicitor General's "minimum" view, presented on behalf of the Secretary and the United States as a whole, to conclude that it has jurisdiction over Ashford's petition.

If the Court does go further, it will find abundant support for the conclusion that the Letter contains "rules" that are reviewable under Section 502. *See McKinney* 796 F.3d at 1383; *Coal. for Common Sense*, 464 F.3d at 1314. The APA's definition of "rule" is "very broad[]." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002). It reaches "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4), and thus "broadly defines an agency rule to include nearly every statement an agency may make," *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C. Cir. 1980).

Importantly, agency interpretations of law that underpin enforcement actions are in the heartland of that definition. "If an agency . . . bases enforcement actions on the policies or interpretations formulated

48

in the document, [or] if it leads private parties or State permitting authorities to believe that it will [take adverse action] unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding,'" and thus qualifies as a "rule." *Appalachian Power*, 208 F.3d at 1020–21; *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (a rule is substantive if "in the absence of the rule there would not be an adequate legislative basis for enforcement action"); *Paralyzed Veterans of Am. v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998) (agency statements that "affect individual rights and obligations" are reviewable under section 502).  The Letter thus qualifies as an "action" to which Section 553 "refers" because it announces legal interpretations that had never before been published and purports to "base[] enforcement actions on" those "interpretations." *See* Appx0001–0003.

The Letter also has "future effect" in the sense that it attempts to "change[] existing law."  *Coal. for Common Sense*, 464 F.3d at 1317. As shown above in Part II.A, the Letter purports to announce (contrary to 38 U.S.C. §§ 3672 and 3682 and 38 C.F.R. § 21.4151) that it may overrule

an SAA's approval determination. That is a new rule that does not appear anywhere in VA's published regulations. And as shown in Part II.B above, the Letter has the practical effect of amending 38 C.F.R. §§ 21.4250 (by adding a new definition) and 21.4266 (by deleting express limitations on the application of the latter regulation's definitions). These are "changes in existing law," *Coal. for Common Sense*, 464 F.3d at 1317, and "amendments to [VA] rules," *McKinney*, 796 F.3d at 1383, which this Court clearly has jurisdiction to review.

In prior briefing, VA has attempted to rely on this Court's decision in *Coalition for Common Sense* to argue that the Letter should be characterized as an "order" that falls outside this Court's Section 502 jurisdiction, rather than an "action" to which the APA's rulemaking provisions "refer[]." According to VA, Dkt. 9, at 15, the Letter must be characterized as an "order" because it was "issued to Ashford as part of an individualized adjudication" and arises from an "adjudicatory process," and thus is distinguishable from the rule-making letter addressed in *Coalition for Common Sense*, which "was not written as part of an adjudicative process, such as an enforcement proceeding against a particular manufacturer." 464 F.3d at 1317. VA's reading of the *Coalition for Common Sense*

decision is unsound. *Coalition for Common Sense* held that a "Dear Manufacturer" letter issued by VA was not an order because it did not arise from any adjudicatory process. *See* 464 F.3d at 1317. But the Court *did not* take the further step of suggesting (as VA now seems to contend) that *every* agency statement that relates to an adjudication or enforcement proceeding lies outside of its Section 502 jurisdiction. That question was neither presented nor decided there.

VA's argument in this case is both novel and dangerous. It would allow VA to place its creation and amendment of regulatory rules beyond the reach of this Court's Section 502 jurisdiction simply by acting through private letters. As this Court has noted, Section 502 reflects Congress's "preference for preenforcement review of agency rules," and was designed to facilitate that review. *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 330 F.3d 1345, 1347 (Fed. Cir. 2003). On VA's view, however, Section 502 would *block* preenforcement judicial review, so long as VA announces and amends its rules through informal actions, rather than through Federal Register publications that inarguably would be subject to review under Section 502. That is not and cannot be the law. The "rule-making provisions of [the APA] . . . may not be avoided by the

process of making rules in the course of adjudicatory proceedings." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969) (plurality op.). And "administrative policies affecting individual rights and obligations [must] be promulgated pursuant to [APA] procedures so as to avoid the inherently arbitrary nature of unpublished ad hoc determinations." *Morton v. Ruiz*, 415 U.S. 199, 232 (1974). It follows that VA cannot evade this Court's Section 502 jurisdiction by issuing new and amended rules in the shadows, rather than by using the transparent publications that the APA requires.

## CONCLUSION

For the foregoing reasons, Ashford respectfully asks the Court grant the Petition for Review and to "hold unlawful and set aside" the Letter. *See* 5 U.S.C. § 706(2).

Filed January 29, 2019
Corrected February 15, 2019

Respectfully submitted,


/s/ Carter G. Phillips

Gerard D. Kelly
SIDLEY AUSTIN LLP
1 South Dearborn
Chicago, Illinois 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

Carter G. Phillips
   *Counsel of Record*
Kwaku A. Akowuah
Tobias S. Loss-Eaton
Daniel J. Hay
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8000
Fax: (202) 736-8711

*Counsel for Petitioner Ashford University, LLC*

53

**STATUTORY & REGULATORY ADDENDUM**

# STATUTES

## 5 U.S.C. § 551

For the purpose of this subchapter . . . .

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing;

(5) "rule making" means agency process for formulating, amending, or repealing a rule;

(6) "order" means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing;

(7) "adjudication" means agency process for the formulation of an order . . . .

## 5 U.S.C. § 552(a)(1)

(a) Each agency shall make available to the public information as follows:

> (1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

>> (A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

>> (B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

>> (C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

>> (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

>> (E) each amendment, revision, or repeal of the foregoing. Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

## 5 U.S.C. § 553

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

    (1) a military or foreign affairs function of the United States; or

    (2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

    (1) a statement of the time, place, and nature of public rule making proceedings;

    (2) reference to the legal authority under which the rule is proposed; and

    (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

    Except when notice or hearing is required by statute, this subsection does not apply—

        (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

        (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise

general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

    (1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

    (2) interpretative rules and statements of policy; or

    (3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

## 38 U.S.C. § 3671

(a) Unless otherwise established by the law of the State concerned, the chief executive of each State is requested to create or designate a State department or agency as the "State approving agency" for such State for the purposes of this chapter and chapters 34 and 35 of this title.

(b)  (1) If any State fails or declines to create or designate a State approving agency, or fails to enter into an agreement under section 3674(a), the provisions of this chapter which refer to the State approving agency shall, with respect to such State, be deemed to refer to the Secretary.

(2) Except as otherwise provided in this chapter, in the case of courses subject to approval by the Secretary under section 3672 of this title, the provisions of this chapter which refer to a State approving agency shall be deemed to refer to the Secretary.

## 38 U.S.C. § 3672(a)

An eligible person or veteran shall receive the benefits of this chapter and chapters 34 and 35 of this title while enrolled in a course of education offered by an educational institution only if (1) such course is approved as provided in this chapter and chapters 34 and 35 of this title by the State approving agency for the State where such educational institution is located, or by the Secretary, or (2) such course is approved (A) for the enrollment of the particular individual under the provisions of section 3536 of this title or (B) for special restorative training under subchapter V of chapter 35 of this title. Approval of courses by State approving agencies shall be in accordance with the provisions of this chapter and chapters 34 and 35 of this title and such other regulations and policies as the State approving agency may adopt. Each State approving agency shall furnish the Secretary with a current list of educational institutions specifying courses which it has approved, and, in addition to such list, it shall furnish such other information to the Secretary as it and the Secretary may determine to be necessary to carry out the purposes of this chapter and chapters 34 and 35 of this title. Each State approving agency shall notify the Secretary of the disapproval of any course previously approved and shall set forth the reasons for such disapproval.

## 38 U.S.C. § 3673

**(a) Cooperation in Activities.—**

The Secretary and each State approving agency shall take cognizance of the fact that definite duties, functions, and responsibilities are conferred upon the Secretary and each State approving agency under the educational programs established under this chapter and chapters 34 and 35 of this title. To assure that such programs are effectively and efficiently administered, the cooperation of the Secretary and the State approving agencies is essential. It is necessary to establish an exchange of information pertaining to activities of educational institutions, and particular attention should be given to the enforcement of approval standards, enforcement of enrollment restrictions, and fraudulent and other criminal activities on the part of persons connected with educational institutions in which eligible persons or veterans are enrolled under this chapter and chapters 34 and 35 of this title.

**(b) Coordination of Activities.—**

The Secretary shall take appropriate actions to ensure the coordination of approval activities performed by State approving agencies under this chapter and chapters 34 and 35 of this title and approval activities performed by the Department of Labor, the Department of Education, and other entities in order to reduce overlap and improve efficiency in the performance of such activities.

**(c) Availability of Information Material.—**

The Secretary will furnish the State approving agencies with copies of such Department of Veterans Affairs informational material as may aid them in carrying out chapters 34 and 35 of this title.

**(d) Use of State Approving Agencies for Oversight Activities.—**

The Secretary may utilize the services of a State approving agency for conducting compliance and risk-based surveys and other such oversight purposes as the Secretary, in consultation with the State approving agencies, considers appropriate without regard to whether the Secretary or the agency approved the courses offered in the State concerned.

## 38 U.S.C. § 3682

Except as provided in section 3674A of this title, no department, agency, or officer of the United States, in carrying out this chapter, shall exercise any supervision or control, whatsoever, over any State approving agency, or State educational agency, or any educational institution. Nothing in this section shall be deemed to prevent any department, agency, or officer of the United States from exercising any supervision or control which such department, agency, or officer is authorized by law to exercise over any Federal educational institution or to prevent the furnishing of education under this chapter or chapter 34 or 35 of this title in any institution over which supervision or control is exercised by such other department, agency, or officer under authority of law.

# **REGULATIONS**

## **38 C.F.R. § 21.4150(a)**

(a) The Chief Executive of each State is requested to create or designate a State department or agency as the State approving agency for his State, for the purpose of assuming the responsibilities delegated to the State under 38 U.S.C. chapter 36, or if the law of the State provides otherwise, to indicate the agency provided by such law.

## 38 C.F.R. § 21.4151

(a) The Department of Veterans Affairs and the State approving agencies will take cognizance of the fact that definite duties, functions and responsibilities are conferred upon each of them. To assure that programs of education are administered effectively and efficiently, the cooperation of the Department of Veterans Affairs and the State approving agencies is essential.

(b) State approving agency responsibilities. State approving agencies are responsible for:

(1) Inspecting and supervising schools within the borders of their respective States;

(2) Determining those courses which may be approved for the enrollment of veterans and eligible persons;

(3) Ascertaining whether a school at all times complies with its established standards relating to the course or courses which have been approved;

(4) Determining those licensing and certification tests that may be approved for cost reimbursement to veterans and eligible persons;

(5) Ascertaining whether an organization or entity offering an approved licensing or certification test complies at all times with the provisions of 38 U.S.C. 3689; and

(6) Under an agreement with VA rendering services and obtaining information necessary for the Secretary's approval or disapproval under chapters 30 through 36, title 38 U.S.C. and chapters 107 and 1606, title 10 U.S.C., of courses of education offered by any agency or instrumentality of the Federal Government within the borders of their respective States.

(c) The Department of Veterans Affairs will furnish State approving agencies with copies of such Department of Veterans Affairs informational and instructional material as may aid them in carrying out the provisions of 38 U.S.C. chapter 36.

## 38 C.F.R. § 21.4152

**(a) Control of educational institutions and State agencies generally prohibited.** No department, agency, or officer of the United States will exercise any supervision or control over any State approving agency or State educational agency, or any educational institution.

**(b) Authority retained by VA.** The provisions of paragraph (a) of this section do not restrict authority conferred on VA

(1) To define full-time training in certain courses.

(2) To determine whether overcharges were made by a school and to disapprove the school for enrollment of veterans or eligible persons not previously enrolled. See § 21.4210(d).

(3) To determine whether the State approving agencies under the terms of contract or reimbursement agreements are complying with the standards and provisions of the law.

(4) To examine the records and accounts of schools which are required to be made available for examination by duly authorized representatives of the Federal Government. See §§ 21.4209 and 21.4263.

(5) To disapprove schools, courses, or licensing or certification tests for reasons stated in the law and to approve schools, courses, or licensing or certification tests notwithstanding lack of State approval.

**38 C.F.R. § 21.4250(a)**

(a) General. The statements made in this paragraph are subject to exceptions found in paragraph (c) of this section.

(1) If an educational institution offers a resident course in a State, only the State approving agency for the State where the course is being offered may approve the course for VA training. If the State approving agency chooses to approve a resident course (other than a flight course) not leading to a standard college degree, it must also approve the class schedules of that course.

(2) If an educational institution with a main campus in a State offers a resident course not located in a State, only the State approving agency for the State where the educational institution's main campus is located may approve the course for VA training. If the State approving agency chooses to approve a resident course (other than a flight course) not leading to a standard college degree, it must also approve the class schedules of that course.

(3) If an educational institution offers a course by independent study or by correspondence, only the State approving agency for the State where the educational institution's main campus is located may approve the course for VA training.

(4) If a training establishment offers a program of apprenticeship or other on-job training, only the State approving agency for the State where the training will take place may approve the course for VA training.

(5) Except as provided in paragraph (a)(6)(ii) of this section, if a State or political subdivision of a State offers a licensing test, only the State approving agency for the State where the license will be valid may approve the test for VA payment.

(6)     (i) If an organization or entity offers a licensing or certification test and applies for approval of that test, only the State approving agency for the State where the organization or en-

tity has its headquarters may approve the test and the organization or entity offering the test for VA payment. This approval will be valid wherever the test is given.

(ii) If the organization or entity offering a licensing or certification test does not apply for approval, and a State or political subdivision of a State requires that an individual take the test in order to obtain a license, the State approving agency for the State where the license will be valid may approve the test for VA payment. This approval will be valid for the purpose of VA payment only if the veteran takes the test in the State or political subdivision of the State where the license is valid.

(7) A course approved under 38 U.S.C. chapter 36 will be deemed to be approved for purposes of 38 U.S.C. chapter 35.

(8) Any course that was approved under 38 U.S.C. chapter 33 (as in effect before February 1, 1965), or under 38 U.S.C. chapter 35 before March 3, 1966, and was not or is not disapproved for failure to meet any of the requirements of the applicable chapters, will be deemed to be approved for purposes of 38 U.S.C. chapter 36.

(9) VA may make tuition assistance top-up payments of educational assistance to an individual to meet all or a portion of an educational institution's charges for education or training that the military department concerned has not covered under tuition assistance, even though a State approving agency has not approved the course in which the individual was enrolled.

## 38 C.F.R. § 21.4266(a)–(b)

(a) **Definitions**. The following definitions apply to the terms used in this section.

(1) **Administrative capability** means the ability to maintain all records and accounts that § 21.4209 requires.

(2) **Certifying official** means a representative of an educational institution designated to provide VA with the reports and certifications that §§ 21.4203, 21.4204, 21.5810, 21.5812, 21.7152, and 21.7652 require.

(3) **Main campus** means the location where the primary teaching facilities of an educational institution are located. If an educational institution has only one teaching location, that location is its main campus. If it is unclear which of the educational institution's teaching facilities is primary, the main campus is the location of the primary office of its Chief Executive Officer.

(4) **Branch campus** means a location of an educational institution that -

(i) Is geographically apart from and operationally independent of the main campus of the educational institution;

(ii) Has its own faculty, administration and supervisory organization; and

(iii) Offers courses in education programs leading to a degree, certificate, or other recognized education credential.

(5) **Extension** means a location of an educational institution that is geographically apart from and is operationally dependent on the main campus or a branch campus of the educational institution.

(b) **State approving agency jurisdiction**.

(1) The State approving agency for the State where a residence course is being taught has jurisdiction over approval of that course for VA education benefit purposes.

(2) The fact that the location where the educational institution is offering the course may be temporary will not serve to change jurisdictional authority.

(3) The fact that the main campus of the educational institution may be located in another State from that in which the course is being taught will not serve to change jurisdictional authority.

# ADDENDUM



**U.S. DEPARTMENT OF VETERANS AFFAIRS**
Muskogee Regional Office
125 South Main Street
Muskogee, OK  74401

November 9, 2017

Dr. Craig Swenson
University President and CEO
Ashford University
8620 Spectrum Center Blvd.
San Diego, CA  92123

Leanna DeKing
Director, Arizona State Approving Agency
3839 N. 3rd Street, Suite 200
Phoenix, AZ 85012

Dear Dr. Swenson and Ms. DeKing:

The purpose of this letter is to notify you that I intend to suspend payment of educational assistance and suspend approval of new enrollments and reenrollments for Ashford University's (Ashford) distance education (i.e., online) programs in 60 days unless corrective action is taken.  I am taking this action because the Arizona State Approving Agency (SAA) has provided insufficient evidence to establish that it has jurisdictional authority over your online programs in accordance with 38 C.F.R. § 21.4250(a)(3).  Consequently, the Arizona SAA's approval does not constitute an approval by the SAA for the State where your educational institution is located, as required by 38 U.S.C. § 3672(a)(1).  Therefore, in accordance with 38 C.F.R. § 21.4210(e), I intend to suspend payment of educational assistance and suspend approval of new enrollments and reenrollments for your online programs if you refuse to take corrective action or do not take corrective action within 60 days.  I am taking these actions in accordance with 38 U.S.C. § 3690(b) and 38 C.F.R. §§ 21.4210(d) and 21.4211(a)(6).

I have reached my conclusion based on the following reasoning:

Section 3672(a)(1) allocates jurisdiction for approval of an educational instutition to the SAA where it "is located."  Section 21.4250(a)(3) implements this authority and clarifies that courses offered by independent study may only be approved for VA educational assistance by the SAA for the State in which the institution's main campus is located.  The term "main

**Appx0001**

campus" is defined in 38 CFR § 21.4266(a)(3) as the location where the primary teaching facilities of an educational institution are located.  There does not appear to be any teaching location in Phoenix, AZ, according to the evidence provided by the Arizona SAA.

The Western Association of Schools and Colleges (WASC) does not list a recognized teaching location for Ashford in Arizona.  Ashford's main campus is listed in San Diego, CA, with an additional campus location in Clinton, Iowa, and an Administrative Online Student Services Center  in Phoenix, Arizona.  Consequently, I conclude that the Phoenix, AZ, location is not a teaching facility for purposes of section 21.4266(a)(3) based on the evidence available to me.  As discussed below in more detail, I encourage you to submit additional evidence to the extent that you disagree with my conclusion.

Additionally, I note that both WASC and the U.S. Department of Education recognize Ashford University's main campus as being in San Diego.  While the school's 2016-2017 Academic Catalog and Supplement do not identify a main campus, it is stated on page 1 of the catalog that "With the growth of the online student population, the University's leadership decided to move its headquarters from Clinton, IA, to San Diego, CA, and to apply for accreditation with [WASC]."  WASC only has jurisdiction to approve institutions with main campuses in California, Hawaii, and the Pacific, as well as a limited number of institutions outside the U.S.  This fact also suggests that the main campus is not in Phoenix, AZ.

Further supporting this conclusion, it appears that the Arizona State Board of Private Postsecondary Education (Board) does not consider Ashford to be an Arizona institution and does not appear to recognize an Ashford teaching location in Arizona.  Ashford is only listed in that office's online directory of out-of-state institutions; therefore, it appears that the Board does not recognize Ashford as an Arizona institution.  Additionally, the Board recognizes a single Ashford  location in Phoenix, which it described merely as an "online administrative and student services center."  Nor are any Ashford programs listed as being approved for the Phoenix location.  For the sake of comparison, the Board does not describe the Phoenix, AZ, location of the University of Phoenix, Online, as an administrative center, instead listing dozens of programs as being taught at that location.  This evidence is consistent with what we received regarding WASC's approval of your school, and also supports my conclusion that the Phoenix, AZ, location is not a teaching location.

Furthermore, the regulation defining "main campus," 38 CFR § 21.4266(a)(3), states that "[i]f it is unclear which of the education institution's teaching facilities is primary, the main campus is the location of the primary office of its Chief Executive Officer [(CEO)]."  Therefore, if a teaching facility existed in Arizona and a disagreement over which of Ashford's teaching facilities is primary existed, the regulations use the location of the primary office of the CEO as the main campus.  The Arizona SAA provided us no evidence that the CEO's primary office is not located at Ashford's Headquarters at 8620 Spectrum Center Blvd., San Diego, CA, suggesting that the main campus would be in San Diego, CA, and not Phoenix, AZ, even under this scenario.

To put it succinctly, the information provided by the SAA strongly indicates that the Phoenix, AZ, location does not meet the definition of a main campus.  Therefore, the Arizona SAA lacks jurisdiction under 38 C.F.R. § 21.4250(a)(3) and, consequently, the SAA's approval of Ashford's online programs does not comply with Title 38 requirements.

Please note that if Ashford fails to remedy this deficiency through corrective action within 60 days, I will suspend payment of educational assistance and suspend approval of new enrollments and reenrollments in your online programs.  I will then refer the matter to the Committee on Educational Allowances in accordance with 38 C.F.R. §§ 21.4210(g), 21.4211 and 21.4212, to assist me in making a determination as to whether educational assistance should be discontinued for all individuals enrolled in your online courses, and, if appropriate, whether approval of all further enrollments or reenrollments in your online courses should be denied to veterans, servicemembers, reservists, or other eligible persons pursuing those courses under educational assistance programs administered by VA.  Ashford will be provided with the opportunity for a hearing before the Committee in accordance with 38 C.F.R. §§ 21.4212-14.  The Committee will make a recommendation to me, and I will render a decision pursuant to 38 C.F.R. § 21.4215 regarding discontinuance.  Ashford will then be afforded an opportunity to request a review of such decision by the Director, Education Service, Veterans Benefits Administration, pursuant to 38 C.F.R. § 21.4216.  However, if Ashford has any additional information regarding the Pheonix, AZ, location that justifies a conclusion that the Phoenix, AZ, location is indeed the "main campus" in accordance with 38 C.F.R. § 21.43266(a)(3), or makes changes to its existing structure, please provide such information to this office as soon as possible as such information may resolve this issue.  Please submit any additional information to U.S. Department of Veterans Affairs, 125 S. Main Street, Muskogee, OK 74401.

I look forward to working with you to ensure that our nation's Servicemembers and Veterans can continue to receive benefits for enrollment in your school's programs.

Sincerely,

C. JASON McCLELLAN
Director, Muskogee Regional Office

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of February, 2019, I filed the foregoing Petitioner's Corrected Opening Brief with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ Carter G. Phillips
Carter G. Phillips

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and the rules of this court, because this brief contains 10,076 words (as determined by the Microsoft Word 2016 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Century Schoolbook font.

/s/ Carter G. Phillips
Carter G. Phillips